to the next case, Continental Tire against Workers' Compensation Comm'n, 511-0092. Counsel, please. Thank you, Your Honor. May it please the Court, Mr. Levin-Hagin. My name is Jim Keefe, and I represent the appellant, Continental Tire. Your Honor, just jumping right into it, we're asking this Court to first look at the Commission's decision to determine whether they can conclude it sui sponte that Mr. Peek, the employee's left shoulder condition after August 18, 2008, was solely related to his repetitive work activities as a tire builder. We're requesting then, if you make that finding, to determine whether the employer was prejudiced by the Commission's determination. And the reason is, it's our position that repetitive trauma was never alleged at the time of hearing. There was a traumatic event on improvement on August 18, 2008, for that traumatic injury. Well, when you say sui sponte, and admittedly, let's say that there was a new theory of recovery that the Commission found in favor of the claimant finding, since we know the Commission has original jurisdiction, is the Commission legally precluded from considering a new theory, even if it was never presented to the arbitrator? Is there a law that says they cannot actually do that, ever? No, sir, and I think we acknowledge that in our brief in the Caterpillar decision, unless the other party's rights are substantially prejudiced, and I believe in this situation, we were. Well, that's what you need to hone in on, because it's almost like you're saying, well, they took it upon themselves to come up with a new theory of recovery, ergo, you know, the respondent must win. Where were you prejudiced? We were prejudiced because we didn't have an opportunity to defend against the repetitive trauma finding by the Commission. We defended against whether the need for the total shoulder replacement after August 18, 2008, was related to this traumatic event. And so we did not have a fair What was your defense that it was not related to that traumatic event? The need for the total shoulder replacement. The opinion of Dr. Michael Degolski was our first opinion. And he was your Section 12 fellow? Yes, sir. He was your second Section 12? That is correct. Your first Section 12 talked about prolonged exposure, didn't it? It did, and that was... That was Rothschild? That was Rothschild. The next three years, he gave you a report three years before the arbitration hearing, did he not? That is correct. So you were not aware of this possibility of the repetitive trauma theory? No, because I'm not certain why Dr. Rothschild addressed the issue of repetitive trauma back in 2006, because by claimant's testimony, he had never had treatment before this traumatic event, okay? And he has an event, and he has an onset of symptoms. And we got an exam with Dr. Rothschild, why he addressed repetitive trauma, I'm not sure. Was it because he had a description of the duties of the claimant? Perhaps, Your Honor. I don't know that. I think probably the file was not even in our office by that time. Here's the point, though, I think, to be made. You're saying all of a sudden, Rothschild comes up with this theory out of left field that you were not expecting. Nevertheless, this theory came out of left field three years before the hearing. So can you honestly say you had no idea that this could be in the mix, when your own doctor said it's in the mix? Yes, I don't think we did, because we even asked the employee at arbitration, the first thing he testified is, on cross-examination, you are claiming that the need for the total shoulder replacement is related to this 2013-06 event. That's what he testified to. He didn't say, no, it's related to my repetitive job activities. His own testimony was, no, I believe it's related to that event. And the reason that we don't think that it can be related to that event, or at least the commission should address that specifically, is that Dr. Flett has said you're at maximum medical improvement for that condition on August the 18th of 2008. Let me ask you this, candid question, blunt question. Did the claimant raise the theory of repetitive trauma in his briefs before the commission? He did. So before they ruled, that was on the table, was it not? It was, but we didn't have an opportunity to take additional evidence at that time. Proofs were closed before the arbitrator. The arbitrator presumably didn't believe repetitive trauma was being alleged, because she found that, no, he was an MMI for the traumatic event, and didn't address the issue of repetitive trauma. All right, so I think I understand. You're saying, we acknowledge the law. We're hinging our argument here that we believe our substantial rights were prejudiced by the way this was handled. Correct. Is that a fair statement? Yes, sir. Fair enough. And part of the reason, too, I think that we were prejudiced is, had we had an opportunity to address the issue of repetitive trauma, it may have been a different result, because the repetitive trauma theory, at least found by the commission, was based upon him doing these job activities from 2001 to 2006. Now, after the traumatic event, he didn't do those job duties anymore. I mean, he was moved to a light-duty position. I think maybe there were four or five days when he went back and tried it as a tire builder. But he never did those again after 2006. He was in permanent light-duty jobs. We paid for his treatment, which included a shoulder surgery with Dr. Paletta. Dr. Paletta said he reached maximum medical improvement. So on that basis, we stopped benefits. We didn't authorize the referral to get a total shoulder consult. And when they went back then to Dr. Paletta, who again said, well, I think he needs a total shoulder consult, and he did mention something about, you know, those work activities could aggravate osteoarthritis in the left shoulder. Again, he did not perform those job duties in 2006. So what we're really just asking is to just go back to the commission and let them decide whether the February 13, 2006 work accident is a cause in the need for the total shoulder replacement. If, in fact, it is, well, I mean, that's a question of fact for the commission. In your honors, if, in fact, you don't believe that, number one, either we were prejudiced by the sub-spontane finding, or I guess, first, that the commission actually concluded the August or the February 13, 2006 traumatic event was a cause in his current condition, because we'll acknowledge the commission did mention that, but I don't know how they reached that conclusion when they adopted the opinion of Dr. Paletta, who said, no, he was MMI for the traumatic event on August the 18th of 2008. But in the event that you thought the commission was correct, we'd ask that the finding by the commission is against the manifest way of the evidence, and that's primarily because, again, to say his job activities from 2001 to 2006 aggravated the condition in 2008 after he had surgery following a traumatic event, I don't think that the evidence supports that. Yes, there was an opinion in 2006 from Dr. Rothrock that those job activities could have aggravated. Well, that was 2006. He was treated and placed at maximum medical improvement. Well, I don't know how you make the leap that doing these job activities last a couple years prior than aggravates the condition after your MMI in August of 2008. So that would be our alternative position, and the court doesn't have any more questions. Thank you, counsel. Counsel, please. May it please the court, my name is Fritz Levenhagen. I represent Petitioner Jeff Peek in this case. Can you answer that last question raised by opposing counsel? Yes, the question of whether or not how you reconcile the maximum medical improvement that Dr. Plata indicated in his opinion, but then also have the still-finding causation as to the shoulder condition. I had asked Dr. Plata, and I was looking for his testimony on that issue, how does he reconcile his opinion in a letter to the adjuster where he states, in my opinion, the need for the continued treatment is not related to the lift incident of February 13, 2006, but is solely related to the natural progression of the underlying osteoarthritis. And I asked him on redirect, how do you reconcile this aggravation of a pre-existing condition with the finding that it's not related to the specific incident? And it was really interesting how he addresses that issue. He says, well, in the history that came from the patient, it appeared that the circumstances, the type of work that he was doing, made his condition symptomatic as a consequence of the work-related incident. He says it was an aggravating factor, and his symptoms, despite all the treatment, the surgical treatment, the non-surgical treatment that I recommended, and the surgical treatment that I recommended, he continued to be symptomatic. His finding was that the maximum medical improvement was attributable to the symptoms he experienced that Dr. Plata attempted to alleviate through the arthroscopic surgery that was performed. However, the underlying condition of the osteoarthritis had already been aggravated. And what's interesting about this case is this gentleman has osteoarthritis in both shoulders. But Dr. Plata, he points out in his testimony that his dominant arm is the symptomatic arm, the left arm. It's the one that he's using to lift the tires and place them on the pants. It's the one that needs to have the shoulder replacement surgery. The other shoulder has osteoarthritis in it, too, but it's not symptomatic. You don't treat that. The symptoms all arise on that dominant side, the one that was aggravated by that work activity. And he says, if you look at his testimony, he says, well, the osteoarthritis, he addresses it in an earlier letter that he writes. He refers to, as he says, in a very prophetic manner in my original note, I make reference to the fact that I believe that he was going to require a total shoulder replacement. And that was long before we took his deposition and long before he even performed the shoulder arthroscopy. He says, just because the patient has arthritis doesn't mean that they need a total shoulder replacement. That doesn't mean that they are going to be symptomatic. But in this case, his symptoms seem to stem from, and he had an onset, with the incident that he described as occurring on February 13, 2006. So I ask him, did you see Dr. Rothrock's report, which is a Section 12 examiner, the first Section 12 examiner that sees Jeff Peek, and that is on July 10, 2006? His injury date again is February 13, 2006. And my question is, do you agree, Dr. Pletter, with Dr. Rothrock's statement in this report that indicates the most likely cause of such rapid degeneration of his glenohumeral joint is the job he performed at Continental Tire, which has required extensive lifting of this dominant arm over a prolonged period? Pletter's answer, yes, I agree with that. I want to point out, I didn't have Dr. Rothrock's record when I first saw Mr. Peek. But, he says, but, in looking at Dr. Ahn's records, I agree with that, with his opinion, and that is consistent with what Dr. Rothrock said. So, but, in this case, Continental Tire is asking that the commission's decision be reversed because it, sua sponte, entered a decision that they believe they were prejudiced against. These opinions on repetitive trauma from Dr. Ahn, from Dr. Chow, from Dr. Rothrock, all indicated that the repetitive trauma was the aggravating factor. Let me just stop you and ask this question. When the matter proceeded to hearing before the arbitrator, what was the theory of recovery of the claim? Was it repetitive trauma? It was that he sustained an accidental injury due to the repetitive work that he performed and that that accident, the condition manifested itself on February 13, 2006. So you proceeded before the arbitrator on the theory of repetitive trauma? Is that what you're telling me? Yes, yeah, yeah, but I still have to prove accident. So I still have to have a date. The opposing counsel is very surprised to hear that. I heard him say that. I don't know what he thought in light of the medical reports that we have that indicate that the repetitive work that he was performing caused the degeneration of his shoulder condition. I understand they don't want to pay for the total shoulder replacement, but in a case like this where the only symptomatic side happens to be the side that's fusing repetitively over the course of time that's aggravating his condition, making it worse, resulting in the need for the surgery, the initial arthroscopic surgery, and thereafter permanent restrictions that he has imposed on him by Dr. Pilata that are ongoing. Those restrictions are in place all the way through arbitration. Well, but if you look at the arbitrator's decision, it seems that maybe the arbitrator took either a left turn or a right turn somewhere, seemed to only address a specific incident. And so, I mean, did the arbitrator get off track somewhere on your theory of recovery? Or is it possible to, as the commission appears to do, ignore the arbitrator to a certain extent, examine the record, and come up with its rationale for benefit award? Well, the arbitrator's decision is puzzling, and the commission goes into great detail about the arbitrator's decision and why they're confused about it, because she says that Dr. Pilata's opinions were equivocal. Well, there's nothing equivocal about saying that this gentleman's repetitive work activities caused his symptoms resulting in rapid degeneration of his clenohumeral joint, which will ultimately result in a total shoulder replacement. Well, there's nothing remarkable about that. I agree. But the question is, and was, where did the arbitrator get this accident date of February 13, 2006? Did you say anything about that in your petition somewhere, or did this just come out of the blue? How do you explain this February 13, 2006 date? That was the day that he was doing his job activities, and he felt a pull in his shoulder. He felt a pull in his shoulder. Yep, that's it. He felt a pull and felt pain, and he went to the health services there at the plant, was seen by the doctor there, and told the doctor that he wasn't sure if it was the weight of the tires or what it was, but it was bothering him, and had been for about a week. And that was only three days after the accident date. But the incident report says what was the cause of it, the problem with your shoulder, and he puts it down, bloating tires. Well, there it is. It's bloating tires. So you're saying that really, in effect, the commission wasn't as off-base as maybe opposing counsel might say, that really this became a manifestation date? Yes. A repetitive period? Yeah. Yes, and the commission, in this case, I think they do a fine job. They go into 14 pages, single space, and analyze all the evidence in a very detailed fashion and talk about how they, and they say specifically, the commission clarifies its views that the specific trauma of February 13, 2006, was the proverbial straw that broke the camel's back, in terms of it being the last of a long sequence of repetitive traumas. And then they cite CISPRO, and they say under Illinois law, claim it's seeking benefits, and they only show that it was a cause of the condition. Well, let's do this. Let's give them their argument it's due. Let's assume that they have a point that somehow this theory of repetitive trauma was obscure and not clear when they went to hearing. What's your position on the second prong of that? They were prejudiced. Their rights were prejudiced. Did they have notice of this? What's your response to that? Whether or not they were prejudiced by, ostensibly, a new or different theory? Well, what addition? You'd have to look at the facts, and the facts are that they were provided with a written incident report by my client, a reported injury, medical records, treatment at the plant about his loading of the tires and how it was causing the symptoms. They also had records from Dr. Pond and Dr. Chow that said that his repetitive loading of the tires has caused a degeneration, resulting in the need for, potentially, total shoulder replacement. Not at that time, but potentially. This is early on, 2006. Then their Section 12 examination says, well, it confirms the same thing, Dr. Pond and Dr. Chow. So they say they're prejudiced. What did they need? What was the evidence that they needed to have that really caught them by surprise here? If I'm prejudiced by something, I'm at a disadvantage. I could have done something differently, but I didn't. Because I was sandbagged. They set me up. But now, if I had just been given the opportunity to present this evidence to the Commission, I could have. So you're saying they were unnoticed. They wouldn't have needed it. They were unnoticed. You're saying, in essence, that this repetitive trauma was at the root of the issue. You're saying they were unnoticed. Oh, yes. Just to summarize. Oh, yes. And they put him on a different job. Doing a battery station position. And they were paying him less money than they were paying him a differential. So I don't know how it was a surprise. But the bottom line is, Your Honors, I believe the Commission did a very good job of analyzing the evidence. And the facts are contained in the record. And this is a manifest way to the evidence case.  Thank you, counsel. Thank you. Mr. Bernal. Yes. Very briefly, Your Honors. Add to the issue of notice of repetitive trauma. If there is no evidence in the record that this guy ever had treatment for his left shoulder before this event where he had the pulling sensation lifting the tire. I mean, there's just no evidence. If, in fact, those job duties are, quote, an aggravation, you would expect that you would have some type of complaints to see a doctor before you actually have the traumatic event. The application for adjustment of claim found by Mr. Levenheck, and I believe it says, the petitioner was injured in the course of his employment. Now, I mean, I wish we could, you know, in circuit court, ask for a more definite statement. But he just said injured in the course of his employment on 213-06. And then when Dr. Paletta said, yeah, that event was an aggravation, we accepted it. We went along with it. To the point that, again, whether we were on notice in the prejudice, it's true that could his job activities have something to do with the arthritis in his shoulder? Yeah, there was medical evidence in there. But arthritis, as Mr. Levenheck acknowledged, is not all that's required to recommend a total shoulder replacement or a joint replacement for that matter. You have to have symptoms. You have to have symptoms and arthritis. He did not have symptoms until this traumatic event. And it aggravated it. And he needed surgery, and we paid for it. And Dr. Paletta said he was at MMI for that. And in the first report, he said, well, his ongoing problems are related to the national progression of the arthritis. Now, whether his job activities back then had something to do with the arthritis, yeah, there's evidence in the record to support that. But was it producing the symptoms? The evidence, as it was presented to us, was that the traumatic event caused the symptoms for which he reached national medical improvement, and then he doesn't do those job activities ever again after February 13, 2006. So really, what we're asking is send it back to the commission and let them address whether it was this 2-13-2006 event, whether that has anything to do with the need for the total shoulder replacement. That's what we're asking. Thank you. The court will take the matter under advisement for disposition.